**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> DEONTE THOMAS, <br><br> Defendant. | No. 21-cr-00375-1 <br> Judge Franklin U. Valderrama |

**MEMORANDUM OPINION AND ORDER**

On November 6, 2020, Chicago Police Department (CPD) officers arrested Defendant Deonte Thomas (Thomas) and recovered drugs, cash, and a semiautomatic pistol with an extended magazine. Thomas was later indicted for: (1) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and (2) possession of a quantity of fentanyl, in violation of 21 U.S.C. § 844. R. 1, Indict.[1] Before the Court is Thomas' motion, pursuant to Federal Rule of Criminal Procedure 12(b)(3), to suppress all fruits from the arrest and detention, which he claims were unlawful under the Fourth and Fifth Amendments of the United States Constitution. R. 29, Mot. Suppress. As discussed further below, the Court denies the motion to suppress because the credible evidence presented at the evidentiary hearing demonstrated that the officers observed Thomas handling a firearm with an extended magazine in a public location, which provided them with a reasonable suspicion to stop and detain Thomas.

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

## Background

In the afternoon of November 6, 2020, CPD Officers Steven Nisivaco (Nisivaco) and Ryan Graal (Graal) were on patrol in an unmarked squad car in the Seventh Police District, which comprises the Englewood neighborhood. R. 38, Tr. 9:20–23. Nisivaco and Graal were traveling northbound through the alley in between Damen Avenue and Seeley Avenue behind another vehicle transporting other members of their enforcement team. *Id.* 14:17–21. The officers were traveling from the 5700 block to the 5600 block when they encountered Thomas, among a group of men, on the sidewalk of the 5600 block between Damen and Seeley, just west of the alley. *Id.* 14:21–25. Nisivaco observed that several of the individuals surrounding Thomas were engaged in a dice game and were smoking cannabis. Tr. 44:22–45:2. The officers testified that they observed Thomas, who was sitting in an office chair on the sidewalk, lift a black firearm upside down by its extended magazine and place the firearm on the ground, leaned against the underside of the chair. *Id.* 15:19–16:8; 37:5–23; 44:10–14. Thomas then stood up from the office chair and began to walk away. *Id.* 44:19–21, 45:3–9; R. 39, GX 202.

The officers parked their vehicle in the alley next to the driveway and exited the vehicle. Tr. 45:3–9, 53:10–20. Nisivaco, who had been driving the squad car, approached Thomas while Graal went to the office chair to recover the firearm. *Id.* 17:20–18:6. Nisivaco stated to Thomas "Come here, man. Put your hands up, put your hands up. What did you drop?" R. 39, GX 201 at 2:00–05. Thomas raised his hands and denied that he had dopped anything. *Id.* at 2:05–07. Nisivaco conducted a limited

pat down, which yielded nothing. *Id.* at 2:07–22. Thomas said, "It wasn't mine, bro." *Id.* at 2:20–23. Nisivaco responded by asking "what wasn't yours?" *Id.* at 2:26–28. Thomas replied, "That gun you all be jacking right there, bro." *Id.* at 2:28–29. Nisivaco responded, "What gun?" *Id.* at 2:29–30. Thomas said, "The gun he just picked up, that one there, bro." *Id.* at 2:30–31.

While Nisivaco was approaching and detaining Thomas, Graal approached the area where Thomas had been sitting and recovered a loaded Glock 22 .40 caliber semiautomatic pistol, bearing serial number NET984, with an extended magazine, from underneath the chair. R. 39, GX 103; Tr. 6:8–13, 17:18–18:6, 20:24–21:5.

Nisivaco then conducted a custodial search of Thomas' person, recovering: (1) a red Ziploc bag with five red Ziploc bags containing a white powder substance from his pants pocket; (2) a red Ziploc bag with two red Ziploc bags and five blue Ziploc bags containing a white powder substance from his inside jacket pocket; (3) a clear knotted plastic bag containing a green leafy substance from his pants pocket; and (4) $1,050 in cash. R. 46-1, GRX 1 at 3; R. 46-2, GRX 2 at 3; Tr. 52:12–53:4.[2] The officers then transported Thomas to a CPD station. GRX 1 at 3; GRX 2 at 3.

On June 14, 2021, Thomas was indicted for: (1) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One); and (2) possession of a quantity of fentanyl, in violation of 21 U.S.C. § 844 (Count Two). Indict. On December 22, 2021, Thomas filed a motion to suppress the drugs, firearm, and cash

---

[2]The Government submitted an Illinois State Police laboratory report with its post-hearing brief indicating that the recovered substances included 1.2 grams of fentanyl and 2.4 grams of cannabis. R. 46-3, GRX 3 at 2

3

recovered on November 20, 2020. Mot. Suppress. The Government filed a response on January 18, 2022, R. 31, Resp., and Thomas filed a reply two days later. R. 32, Reply. On April 28, 2022, the Court conducted an in-person evidentiary hearing on Thomas' motion to suppress. R. 37. On June 27, 2022, the Government and Thomas submitted post-hearing briefs. R. 46, Gov. Post-Hearing Br.; R. 47, Def. Post-Hearing Br.

## Analysis

Thomas moves to suppress all fruits from his arrest and search, which he maintains were unlawful under the Fourth and Fifth[3] Amendments of the United States Constitution. Def. Post-Hearing Br. at 1. More specifically, Thomas argues that the Government failed to carry its burden at the evidentiary hearing to prove: (1) that CPD had the requisite reasonable suspicion to detain Thomas; and (2) that the recovered firearm was abandoned property, such that it would not be subject to the Fourth Amendment. *Id.* at 2. The Court finds, as explained below, that the credible evidence shows that the officers observed Thomas handling a firearm with an extended magazine in a public space. As a result, the officers had a reasonable suspicion to stop and detain Thomas and could lawfully conduct a search incident to Thomas' arrest.[4]

---

[3]Because the Court does not reach the parties' abandonment arguments, *see infra* n.4, the Court does not address Thomas' contention that "[i]f Mr. Thomas denied ownership of the gun, his answers were the result of police misconduct during . . . a custodial interrogation in violation of *Miranda*." Def. Post-Hearing Br. at 12 (citing *United States v. Leshuk*, 65 F.3d 1105, 1111(4th Cir. 1995)).

[4]The Court therefore does not address Thomas' argument that the Government did not prove that Thomas abandoned the firearm.

4

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. This "protection extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Yet, while a search or seizure generally runs afoul of the Fourth Amendment if it is not supported by probable cause, the Supreme Court in *Terry* held that "police officers may briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot." *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Terry*, 392 U.S. at 21–22).

Under that less exacting standard, reasonable suspicion exists when law enforcement can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion is less than probable cause, but more than an officer's mere hunch, *see United States v. Tipton*, 3 F.3d 1119 (7th Cir. 1993) (citations omitted), and courts evaluate reasonable suspicion by considering "the totality of circumstances known to the officers at the time of the stop," which includes "the experience of the law enforcement agent and the behavior and characteristics of the suspect." *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000) (internal quotation marks and citations omitted). Reasonable suspicion is assessed at the time the seizure occurred. *See Terry*, 392 U.S. at 21–22 (citations omitted) ("[W]ould the facts

5

available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

Here, the evidence produced at the suppression hearing, including the officers' testimony and body worn camera recordings, show that at the time of seizure—when Thomas submitted to Nisivaco's instruction to "[c]ome here" and "[p]ut your hands up, Nisivaco had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] that intrusion." *Terry*, 392 U.S. at 21. As Nisivaco credibly testified at the evidentiary hearing, on the day of November 6, 2020, he was driving an unmarked squad car during a patrol ride when he observed Thomas reach towards his lap and lift a firearm which he was holding upside down by an extended magazine and place it on the ground underneath the office chair he was sitting on. Tr. 44:10–14. As Nisivaco testified, he had experience with extended magazines and had observed an individual with a firearm equipped with an extended magazine on approximately 50 occasions. *Id.* 41:2–6. Nisivaco then observed Thomas walk away from the office chair. *Id.* 45:3–6. Nisivaco and Graal testified that the office chair Thomas had been sitting in was located on a public sidewalk in between a garage and driveway. *Id.* 21:15–17; 29:24–25:2; 37:24–38:1. At that point, Nisivaco exited the vehicle and approached and detained Thomas. *Id.* 45:9–11. Because it is unlawful in Cook County to possess a large capacity magazine, *see* Cook County, Ill. Code §§ 54-211, 54-212(a), and because it is illegal under Illinois law to openly possess or carry a firearm on public land, such as a sidewalk, *see* 720 ILCS 5/24-1(a)(10); *People v. Grant*, 2014 IL App (1st) 100174-B, ¶ 35, 24 N.E.3d 80,

93, Nisivaco's observation of Thomas with a firearm with an extended magazine on a public sidewalk provided him with a reasonable suspicion that criminal activity was afoot. Thus, Nisivaco's stop of Thomas passes muster under *Terry*'s reasonable suspicion test.

Further, once Nisivaco and Graal confirmed that the firearm Thomas had been handling was a firearm containing an extended magazine, the police had probable cause to arrest Thomas. That is, once Graal went to the office chair Thomas had been sitting in and retrieved the firearm, he confirmed that the firearm had an extended magazine, which gave the officers probable cause to arrest Thomas for violating the Cook County ordinance. R. 39, GX 103; Tr. 6:8–13, 17:18–18:6, 20:24–21:5. As a consequence, it was lawful for the officers to conduct a search incident to arrest, which yielded the narcotics and cash recovered in this case. *See Campbell v. Miller*, 499 F.3d 711, 716–17 (7th Cir. 2007) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.").

Thomas advances two main arguments for why the officers lacked reasonable suspicion to stop him. First, Thomas argues that the evidence shows that CPD stopped Thomas by way of a "jump out." Def. Post-Hearing Br. at 2–5. Second, Thomas argues that the officers' testimony is implausible. *Id.* at 5–9. The Court disagrees with each of Thomas' contentions.

7

To start, the evidence does not show that CPD conducted a "jump out" in this case. A "jump out" occurs when "groups of officers, frequently in plain clothes and riding in unmarked vehicles driving rapidly toward a street corner or group of individuals and then jumping out and rapidly advancing, often with guns drawn . . . the officers then zero-in on the fleeing person and give chase." *Doornbos v. City of Chicago*, 868 F.3d 572, 587 (7th Cir. 2017) (internal quotation marks and citations omitted). The essence of a jump out is that the police officers do not have probable cause or a reasonable suspicion to believe that any crime has occurred, but rather, the officers reverse-engineer probable cause and/or reasonable suspicion based upon what their search of the fleeing person yields. The "jump out" tactic has been criticized—and rightly so in this Court's view—for being dangerous, for fostering resentment in the community, and for eroding trust in law enforcement. *Id.*

Thomas insists that the evidence shows that the two vehicles of officers had planned a "jump out" based on the following: (1) Graal had his hand on the door handle when Nisivaco stopped their vehicle; (2) the officers in the other vehicle simultaneously stopped their vehicle when Nisivaco stopped his vehicle; (3) and multiple men springing out of unmarked cars caused Thomas to jump out of his chair and walk away. Def. Post-Hearing Br. at 4–5. But the evidence presented at the evidentiary hearing refutes Thomas' "jump out" arguments.

The body worn camera evidence shows that while Graal and Nisivaco left their vehicle at the same time, they did not jump out in an intimidating fashion to startle the individuals gathered with Thomas near the garage and driveway. Instead,

8

Nisivaco beelined for Thomas, and Graal beelined for the firearm under the office chair, which is consistent with their testimony that they stopped the vehicle after observing Thomas handling a firearm with an extended magazine. In addition, the video evidence shows that the front vehicle's brake lights were on (with all doors closed) at the time that Nisivaco and Graal exited their vehicles. R. 39, GX 201 at 2:00. That evidence indicates that the front vehicle did not stop until officers in that vehicle observed Nisivaco and Graal exit their vehicle, which goes against Thomas' contention that the officers in both vehicles had coordinated a "jump out." That contention is also belied by the calm and slow nature in which the police officers interacted with the individuals on the scene; the video evidence shows that no officer jumped out of a vehicle with a gun drawn in order to initiate a chase.

Thomas also gets the sequence of events wrong; Thomas did not jump out of his chair and walk away because officers were "springing out" of vehicles (which again they did not spring out of their vehicles). Rather, the body warn camera evidence shows that Thomas had already placed the firearm under the office chair and walked away before Nisivaco and Graal exited their vehicle. *See, e.g.*, R. 39, GX 202. In addition, both police officers credibly denied conducting a "jump out." Tr. 34:21–35:4, 63:16–64:2. All in all, the Court finds that a "jump out" did not occur in this case.

The Court, moreover, disagrees that the police officers' testimony in this case "def[ies] logic and human capabilities." Def. Post-Hearing Br. at 8. In particular, the Court finds it credible that Nisivaco, an officer who has seen approximately 50 individuals with firearms equipped with extended magazines could recognize a black

9

firearm with an extended magazine from a close distance in the daytime. Thomas posits that the officers would have had to have x-ray vision to see the firearm because body warn camera pictures show that the office chair Thomas was sitting in was facing away from Nisivaco's vehicle. Def. Post-Hearing Br. at 7. But those pictures were taken after Nisivaco and Graal had exited their vehicle and after Thomas had left the office chair and walked in the opposite direction of the police officers. Thus, they do not show what direction the office chair was facing at the time that Thomas was sitting in it, when Nisivaco and Graal were observing Thomas from their vehicle. Thomas additionally argues that Nisivaco asking Thomas what he dropped shows that Nisivaco did not know what Thomas was holding, but as Nisivaco credibly testified, he knew that Thomas had dropped the firearm with the extended magazine. Tr. 45:14–16, 64:16–24.

Along similar lines, the Court does not find it implausible that the officers could recognize that the firearm had an extended magazine. Thomas insists that the pictures show that the gun was lying flat on the ground and wedged under the chair's leg with the magazine facing away from the alley. Def. Post-Hearing Br. But the credible testimony at the hearing and the photographs show that Thomas had leaned the gun upside down, with the top of the gun on the ground, and with the extended magazine up in the air. From those photographs, in particular the photograph from Nisivaco's body worn camera when he was patting down Thomas, the extended magazine is visible and prominent. *See* R. 39, GX 203; Tr. 47:24–48:25. It is therefore plausible that the officers could recognize that the gun had an extended magazine,

10

even if only approximately four inches of the extended magazine protrudes from the bottom of the firearm handle. *See* Tr. 23:17–20.

In any event, even if the officers had not seen the extended magazine, they still had reasonable suspicion in light of Thomas' open carrying of a weapon on a public sidewalk, as it is illegal for even licensed gunowners to openly possess a gun on public land. *See Thompson*, 2019 IL App (1st) 162437-U, ¶ 25, *appeal denied*, 135 N.E.3d 581 (Ill. 2019) ("openly carrying a firearm in a public street or alley" is an offense unless the firearm is "fully concealed or partially concealed"); *United States v. Swinney*, 463 F. Supp. 3d 851, 857 (N.D. Ill. 2020) (holding that, "under Illinois law, even if [defendant] had possessed a concealed carry permit (which [defendant] does not argue that he did), it would have been illegal for him to brandish the gun on a public sidewalk.").

Thomas directs the Court to *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018) and *United States v. Cotton*, 420 F. Supp. 3d 777, 783 (N.D. Ill. 2019) for the proposition that the mere presence of a gun did not give CPD justification to stop Thomas, Def. Post-Hearing Br. at 8, but both cases are distinguishable. In *Watson*, the Seventh Circuit held that an anonymous emergency call from a 14-year old reporting that "boys" were "playing with guns" did not provide a reasonable suspicion that criminal activity was afoot. 900 F.3d at 896. The Seventh Circuit found that "a mere possibility of unlawful use" of a gun is not sufficient to establish reasonable suspicion." *Id.* And in that case, "the connection to unlawful activity [was] just too speculative" in that "'boys'" could be a generic term for men of any age, and 'playing

11

with guns' could mean displaying them, which is not criminal conduct. Lacking detail, the report of guns in public does not suggest criminal activity." Here, by contrast, Nisivaco had more than a "mere possibility of unlawful use" of a gun; he testified that he observed Thomas, on a public sidewalk, openly brandishing a firearm with an extended magazine.

Likewise in *Cotton*, the court held that police officers did not have reasonable suspicion to stop a van with a temporary plate matching the description provided by a confidential informant with only the confidential informant's tip that an armed black man had entered a high crime area known for gang activity. 420 F. Supp. 3d at 784. The court reasoned that "[a]lthough the source was reliable, the tip did not describe conduct that was necessarily criminal. Therefore, the tip was not enough to create a reasonable suspicion of criminal activity . . . ." *Id.* In this case, Nisivaco was not relying on a confidential informant's tip which did not describe criminal conduct. Rather, Nisivaco observed Thomas handling a gun with an extended magazine on a public sidewalk, which activity provide him with reasonable suspicion that two crimes were taking place. *See United States v. Triplett*, 2020 WL 7319573, at *2 (N.D. Ill. Dec. 11, 2020).

Bringing it all together, the officers had a reasonable suspicion that criminal activity was afoot when they stopped Thomas because they had observed Thomas handling a firearm with an extended magazine on a public sidewalk. As a result, the officers did not violate Thomas' Fourth Amendment rights. And, once the officers confirmed that the firearm indeed had an extended magazine, the officers had

12

probable cause to arrest Thomas, which allowed them to conduct a search incident to arrest. A subsequent custodial search led to the officers recovering narcotics and cash. Because the evidence shows that the officers did not violate Thomas' Fourth Amendment rights, the Court denies the motion to suppress.

## Conclusion

For the foregoing reasons, Thomas' motion to suppress [29] is denied.

Dated: July 25, 2022

_____
United States District Judge
Franklin U. Valderrama